No. 22-5334

*NO DATE FOR ORAL ARGUMENT HAS BEEN SET*

# In the United States Court of Appeals For the District of Columbia Circuit

———————————

SANDPIPER RESIDENTS ASSOCATION, ET AL.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF HOUSING
& URBAN DEVELOPMENT,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the District of Columbia, Civ. A.
No. 1:20-cv-01783-RDM
The Honorable Judge Randolph D. Moss

———————————

**BRIEF FOR PLAINTIFFS-APPELLANTS
SANDPIPER RESIDENTS ASSOCIATION,
LARRY BERNARD BROOKS AND BETTY ANN DERGIN**

———————————

Kimberly Brown Myles
Velimir Rasic
LONE STAR LEGAL AID
PO Box 398
Houston, TX 77001-0398
Tel: 713.652.0077
Fax: 713.652.3141
kbrown@lonestarlegal.org
vrasic@lonestarlegal.org
*Counsel for Plaintiffs-Appellants*

Laura B. Beshara
Michael M. Daniel
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, TX 75226
Tel: 214.939.9230
Fax: 214.741.3596
laurabeshara@swbell.net
daniel.michael@att.net
*Of-Counsel for Plaintiffs-Appellants*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

(1) Parties

The Appellants are Sandpiper Residents Association, Larry Bernard Brooks and Betty Ann Dergin. The Appellee is the United States Department of Housing and Urban Development. There were no other parties or participants in the proceedings below.

(2) Rulings Under Review

The rulings under review are:

Judge Randolph D. Moss's Memorandum Opinion (Dkt. No. 48) granting Defendant United States Department of Housing and Urban Development's Motion to Dismiss the complaint and denying Plaintiffs' motion for preliminary injunction and the Order dismissing the complaint and denying the motion (Dkt. No. 49) are under review and are in the Joint Appendix at JA308-342.[1] This opinion is published at *Sandpiper Residents Assn. v. U.S. Dept. of Hous. and Urb. Dev.*, CV 20-1783 (RDM), 2022 WL 1604717 (D.D.C. May 21, 2022).

Judge Randolph D. Moss's Memorandum Opinion and Order (Dkt. No. 54) denying Plaintiffs' Federal Rule of Civil Procedure 59(e) motion for reconsideration and to alter or amend the judgment is under review. This ruling is in the Joint Appendix at JA353-359.This opinion and order is published at *Sandpiper Residents*

---

[1] The citation to "JA_" refers to the Joint Appendix in this case.

i

*Assn. v. U.S. Dept. of Hous. and Urb. Dev.*, CV 20-1783 (RDM), 2022 WL 16744906 (D.D.C. Nov. 4, 2022).

    (3) Related Cases

    This case was not previously before this or any other court other than the District Court case that is the subject of this appeal. There are no related cases.

## CORPORATE DISCLOSURE

    The Sandpiper Residents Association is an unincorporated association. The group's purpose is to ensure that appropriate repairs and renovations are completed at the property so that residential units are habitable. The Association has no parent companies and there are no publicly-held companies that have a 10% or greater ownership interest in the certifying parties. No members of the Association have issued shares or debt securities to the public.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

CORPORATE DISCLOSURE .................................................................... ii

TABLE OF CONTENTS.............................................................................. iii

TABLE OF AUTHORITIES ......................................................................vi

GLOSSARY..................................................................................................1

JURISDICTIONAL STATEMENT .............................................................1

PERTINENT STATUTES, REGULATIONS, AND OTHER
     AUTHORITIES...................................................................................2

STATEMENT OF THE ISSUES...................................................................3

STATEMENT OF THE CASE.......................................................................4

    I.     Statement of facts.........................................................................4

         A.     Introduction ........................................................................4

         B.     In 2019, CAA funds were available for vouchers after HUD issued a Notice of Default to the owner, but HUD did not allow the tenants to move. The tenants remained in conditions of imminent health and safety risks.............................8

         C.     In 2020, CAA funds were available for vouchers, but HUD did not let the tenants move. The tenants remained in conditions of imminent health and safety risks...........................11

         D.     In 2021, CAA funds were available for vouchers, but HUD did not let the tenants move. The tenants remained in conditions of imminent health and safety risks...........................13

         E.     Conditions of imminent health and safety risks remain at Sandpiper and will remain even after the proposed rehabilitation.................................................................15

         F.     White tenants in the majority white PBRA projects in white neighborhoods of the Galveston region are not subject to the failing, substandard housing conditions of the Black area PBRA projects. ..........................................................18

    II.    Procedural history and the rulings presented for review ......................20

SUMMARY OF THE ARGUMENT .................................................................21

ARGUMENT ...............................................................................................26

I.  Standard of Review....................................................................26

II.  The sale of the property did not moot the Tenants' claims under the CAA provisions for voucher assistance for units that currently pose an imminent health and safety risk to residents after a Notice of Default with respect to the property ..........................................26

   A.  The District Court erred in holding that the case was moot........26

   B.  Payment for claims accruing during the period of an appropriation act is not mooted by the end of the period for which the funds are appropriated. ................................................27

   C.  There is also an equitable principle supported by 31 U.S.C. § 1502(b) that applies to prevent mootness..................................30

   D.  The specific wording of the CAA provision shows that the 2021 change in ownership did not moot the Tenants' claims under the relevant appropriations.................................................32

   E.  The Notice of Default was issued with respect to the Sandpiper property and continues to apply to the property. ........35

III.  The CAA does not require a pending enforcement action for vouchers to be issued. ...............................................................37

IV.  It was error to hold the tenants' discrimination claims were moot because of the sale of the property because the tenants sought other relief aside from CAA tenant protection vouchers...............................40

   A.  HUD is providing different standards of housing to similarly situated PBRA tenants based on race...........................................40

   B.  The Second Amended Complaint sought relief other than just CAA vouchers. This relief makes the case not moot. ...........41

   C.  Plaintiffs' intentional discrimination claims for CAA voucher relief are not moot. ..........................................................43

V.  The record demonstrates that the conditions at the Sandpiper complex meet the "capable of repetition" exception to mootness especially given the likelihood that the complex will continue to pose imminent health and safety risks to the tenants. ...........................43

VI.  The District Court erred in finding that the redressability element of standing is not present .........................................................47

iv

VII.   The District Court erred in denying the Motion for Preliminary Injunction based on lack of jurisdiction over Appellants' claims on the merits...................................................................................50

CONCLUSION ....................................................................................51

CERTIFICATE OF COMPLIANCE......................................................54

CERTIFICATE OF SERVICE ..............................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abuzeid v. Mayorkas*,
  2023 WL 2543024 (D.C. Cir. 2023) ...............................................26

*Brown v. District of Columbia*,
  514 F.3d 1279 (D.C.Cir.2008)........................................................26

*Carr v. U.S.*,
  560 U.S. 448 (2010) ............................................................... 23, 34

*Chafin v. Chafin*,
  568 U.S. 165 (U.S.2013)..................................... 25, 26, 43, 49, 50

*Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. D.C.*,
  972 F.2d 365 (D.C. Cir. 1992)........................................................44

*Clients' Council v. Pierce*,
  711 F.2d 1406 (8th Cir. 1983) .......................................................42

*Dobrova v. Holder*,
  607 F.3d 297 (2d Cir. 2010) ................................................... 23, 33

*Emerald Mines Co. v. Fed. Mine Safety and Health Rev. Commn.*,
  863 F.2d 51 (D.C. Cir. 1988)..........................................................34

*Hills v. Gautreaux*,
  425 U.S. 284 (1976) ......................................................................41

*J.T. v. District of Columbia*,
  983 F.3d 516 (D.C. Cir. 2020)................................................ 23, 44, 45

*Jerome Stevens Pharm., Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005)......................................................26

*Knox v. Service Employees*,
  567 U.S. U.S. 298 (U.S. 2012)................................................. 26, 42

*Lincoln v. Vigil*,
  508 U.S. 182 (1993).......................................................................48

*Marino v. Natl. Oceanic and Atmospheric Administration*,
  33 F.4th 593 (D.C. Cir. 2022).........................................................47

*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021)................................................. 22, 31, 48, 51

Authorities upon which we chiefly rely are marked
with asterisks*.

*Walker v. HUD*,
   734 F. Supp. 1231 (N.D. Tex. 1989) ................................................42

*\*Westchester v. U.S. Dept. of Hous. and Urb. Dev.*,
   778 F.3d 412 (2d Cir. 2015) ................................................ 22, 28

*\*Weyerhaeuser Co. v. U.S. Fish and Wildlife Service*,
   139 S. Ct. 361 (2018) ................................................ 25, 49

*Zukerman v. United States Postal Service*,
   961 F.3d 431 (D.C. Cir. 2020) ................................................ 26, 29

**Constitutional Provisions**

Fifth Amendment, Equal Protection Clause ........................................50

**Statutes, Rules and Regulations**

24 C.F.R. § 200.857(i)(4) ................................................ 25, 38, 42

5 U.S.C. § 706(2) ................................................25

5 U.S.C. § 706(2)(A) ................................................49

28 U.S.C. § 1291 ................................................2

28 U.S.C. § 1331 ................................................1

*31 U.S.C. § 1502(b) ................................................ 22, 28, 30, 31

*31 U.S.C. § 1552(a) ................................................ 22, 27, 28

*31 U.S.C. § 1553(a) ................................................ 22, 27, 28, 31

*31 U.S.C. § 1553(b) ................................................ 22, 27, 30

*31 U.S.C. § 1553(b)(1) ................................................28

*31 U.S.C. § 1553(b)(2) ................................................ 28, 30

42 U.S.C. §1437f(a) ................................................4

42 U.S.C. §1437f(f)(6) ................................................5

*Consolidated Appropriations Act, 2017,
   Public Law 115-31, 131 Stat. 135,
   May 5, 2017 (CAA 2017) ................................................46

*Consolidated Appropriations Act, 2018,
   Public Law 115-141, 132 Stat. 348,
   March 23, 2018 (CAA 2018) ................................................46

*Consolidated Appropriations Act, 2019,
　　P.L.116-6, 133 Stat. 13,
　　Feb. 15, 2019 (CAA 2019).......................................... 6, 8, 15, 23, 35, 36, 39, 46

*Consolidated Appropriations Act, 2020,
　　Public Law 116-94, 133 Stat. 2534,
　　Dec. 20, 2019 (CAA 2020) .......................................................11, 15, 39, 46, 48

*Consolidated Appropriations Act, 2021,
　　Public Law 116-260, 134 Stat. 1182,
　　Dec. 27, 2020 (CAA 2021) ........................ 13, 14, 15, 21, 25, 36, 39, 42, 46, 48

*Consolidated Appropriations Act, 2022,
　　Public Law 117-03, 136 Stat. 49,
　　March 15, 2022 (CAA 2022) ................................................................. 30, 46

*Consolidated Appropriations Act, 2023,
　　Public Law 117-238, 136 Stat. 4459,
　　December 29, 2022 (CAA 2023) ............................................................ 30, 46

Fed. R. App. P. 4(a)(1)(B) .............................................................................2

Fed. R. App. P. 59(e) ....................................................................................1

Fed. Rule 12(b)(1) .......................................................................................26

## Other Authorities

§ 8381 Vacation and Remand of Agency Action,
　　33 Fed. Prac. & Proc. Judicial Review § 8381 (2d ed.)....................................49

*1 U.S. Government Accountability Office,
　　Principles of Federal Appropriations Law (3d ed. 2004)......... 22, 28, 29, 30, 31

162 Cong. Rec. S2946 (May 18, 2016) (statement Sen. Rubio) ............... 21, 38, 48

Chicago Manual of Style
　　¶ 5.119 (15th ed.2003)....................................................................................33

*TRANSPORTATION, HOUSING AND URBAN DEVELOPMENT, AND
　　RELATED AGENCIES APPROPRIATIONS ACT, 2016-Continued,
　　Congressional Record May 18, 2016 – Issue: Vol. 162, No. 79 – Daily
　　Edition, 114th Congress (2015-2016) – 2nd Session, S2935, S2944-
　　S2946, Rubio Amendment 3986 (May 18, 2016) (Senator Rubio Senate
　　Floor Speech) ....................................................................................................34

USAspending.gov website,
　　https://www.usaspending.gov/federal_account/086-0303 ...............................29

## GLOSSARY

CAA – The Consolidated Appropriations Act for the year indicated. *e.g* CAA-2019 is the Consolidated Appropriations Act for 2019.

HAP – Housing Assistance Payments Contract

HUD- United States Department of Housing and Urban Development

PBRA - Project-Based Rental Assistance

Sandpiper Cove Apartments property is also known as Compass Pointe Apartments

Tenants – the Plaintiffs in the District Court and the Appellants in this Court.

TPV or Voucher – Tenant Protection Voucher or CAA voucher

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331.

The District Court issued its Memorandum and Opinion granting Defendant United States Department of Housing and Urban Development (HUD)'s Motion to Dismiss the Second Amended Complaint and denying Tenant Plaintiffs' motion for preliminary injunction on May 21, 2022. JA9. Tenants filed their Fed. R. App. P. 59(e) motion on June 15, 2022. JA9. The District Court issued its Memorandum Opinion and Order denying Plaintiffs' Fed. R. Civ. P. 59(e) motion for reconsideration and to alter or amend the judgment on November 4, 2022. JA10.

The Tenants' notice of appeal was filed on December 20, 2022. JA10. This appeal is timely filed under Federal Rule of Appellate Procedure 4(a)(1)(B), and 4(a)(4)(iv).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the decision on appeal is a final decision of a District Court of the United States that disposes of all claims.

## PERTINENT STATUTES, REGULATIONS, AND OTHER AUTHORITIES

These authorities are contained in the separately bound Addendum.

## STATEMENT OF THE ISSUES

1. Did the District Court err in construing the Consolidated Appropriations Act (CAA) to prevent HUD from issuing tenant protection vouchers even though Appellants met the prerequisites of the CAA from 2019 through the sale in October 2021, the risks of imminent health and safety risks continued to harm Appellants, and the 2019-2021 CAA funds remained available for use?

2. Did the District Court err by not following the statutory requirement that even after the fiscal year has ended, the CAA funds appropriated for that fiscal year retain their fiscal year identity and remain available for judicial remedy for the claims that accrued under the Notice of Default issued to the 2019-2021 Sandpiper owner?

3. Did the District Court err in holding that the CAA claims required a pending HUD enforcement action and thus when HUD declared the enforcement action to be over with the sale of the property that this extinguished the Tenants' claims?

4. Did the District Court err in holding that the Tenants' intentional discrimination claims that sought relief in addition to the CAA vouchers were moot because of the sale of the property to the New Owner?

5. Did the District Court err in holding that HUD's decision to withhold CAA tenant protection vouchers fails to meet "capable of repetition but evading review" exception to mootness despite the extensive facts set forth in the Second Amended

Complaint establishing the likelihood that the complex will fail another HUD inspection resulting in a Notice of Default to the New Owner?

6. Did the District Court err in denying the Motion for Preliminary Injunction based on lack of jurisdiction over Appellants' claims on the merits?

## STATEMENT OF THE CASE

### I. Statement of facts

### A. Introduction

Plaintiffs are current tenants at Sandpiper Cove Apartments (Sandpiper) located in Galveston, Texas. This privately owned apartment complex is subsidized through a contract between the owner and the U.S. Department of Housing and Urban Development under HUD's Project-Based Rental Assistance (PBRA) program. JA14. The purpose of the PBRA program is to aid low-income families in obtaining a decent, safe, and sanitary place to live by subsidizing private landlords. 42 U.S.C. §1437f(a). The Sandpiper owner completely failed to provide decent, safe, and sanitary housing to the tenants, and HUD chose to leave the tenants in unsafe, substandard housing despite having Congressionally allocated vouchers to let them move and find decent housing.

The Sandpiper tenants have lived in horrific conditions in units that pose imminent health and safety risks for years. Despite the federal subsidies to the owner, the unit, project, site and neighborhood conditions at Sandpiper are dangerous and

4

unfit for family life and the presence of children. HUD inspections revealed inoperable air conditioning, electrical failures, overflowing sewage, and complete structural failures. Many of the individual units lacked operable doors, windows with locks, and lacked basic sanitary equipment including sinks, toilets, showers, heaters, operable air condition, and refrigerators that work. There is widespread mold and other growth on the interior and exterior of the units. Some roofs leak with seeping moisture. Hazardous conditions include lead, mold and asbestos in the units as well as soil contamination onsite. JA16-17.

The Sandpiper tenants remained trapped in these life-threatening conditions. Under the PBRA program, the subsidy is tied to the unit and the tenants are unable to transfer the assistance to another location. 42 U.S.C. §1437f(f)(6). If the tenants leave, then they will lose their federal subsidy and they are unable to afford housing without it. JA55, 83.

HUD provides approximately two million dollars in annual rent subsidies to the Sandpiper owner for the 192 PBRA units at the complex for the tenants living in these severely substandard conditions.[2] HUD's contract with the owner requires the owner to provide decent, safe, and sanitary housing pursuant to HUD regulations. JA14, 228, 276. Despite this obligation, in 2019 HUD found life threatening health

---

[2] The PBRA tenants further pay a portion of their income for their share of the rent. JA14.

and safety deficiencies at Sandpiper and declared the owner to be in default of the contract and regulation obligations because of those deficiencies. JA77-79.

For each Consolidated Appropriations Act (CAA) during the pendency of the claims at issue (2019-2021), Congress made millions of dollars available for vouchers for HUD to allow tenants to escape conditions of imminent health and safety risks at a failed PBRA project. The CAA states:

> That the Secretary may provide section 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract funded under the "Project-Based Rental Assistance" heading under this title where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents.[3]

HUD refers to this CAA "section 8 rental assistance" as "Tenant Protection Vouchers" (vouchers or CAA vouchers). JA209. The requirements for these vouchers are a PBRA contract funded by HUD, a Notice of Default to the owner, and the units pose an imminent health and safety risk to residents.

Because all of these CAA requirements were met after HUD issued the Notice of Default in 2019, the tenants asked HUD for vouchers to move to decent, safe, and sanitary housing. JA82-85. HUD did not provide the vouchers. JA15-17. The Sandpiper tenants continued to suffer in unsafe and hazardous living conditions. JA25-29, 49-55, 246-267.

---

[3] *See, e.g.,* Consolidated Appropriations Act, 2019, P.L.116-6, 133 Stat. 13, 436, Feb. 15, 2019 (CAA 2019)

Each month after HUD issued a notice of default, HUD continued to pay the Owner that it had found to be in default of the contractual and legal requirements to provide basic standard housing. JA18, 24-25.

Two and a half years after HUD found the owner to be in default of the requirement to provide decent, safe, and sanitary housing, the owner sold Sandpiper to a new owner in October 2021 with HUD's approval. JA18. The new owner obtained tax exempt bond funds and low-income housing tax credit funds to pursue a rehabilitation of Sandpiper. JA18. The process for the scope of work to be performed revealed additional and new imminent health and safety risks that will not be addressed by the proposed rehabilitation. JA25-29. The Sandpiper project continues to face imminent health and safety risks even with the limited remodel. JA41-43, 50-52, 300-307. Four months after the sale to the new owner, the property again failed a HUD inspection for failure to protect the Tenants against crime, unit conditions that failed to meet the decent, safe, and sanitary requirements, and lead controls. JA300-307.

The Sandpiper PBRA tenants are predominantly Black or Hispanic. JA59. The Sandpiper and other PBRA tenants located in Black and Hispanic neighborhoods in the Galveston area are disproportionately subject to failing, substandard and life-threatening housing conditions compared to white PBRA tenants. JA59-62. White non-Hispanic PBRA tenants in the Galveston area are not subject to life threatening

housing conditions. White PBRA tenants reside in PBRA projects located in white neighborhoods in housing that meets HUD's housing quality standards. JA231-234, 243.

**B.     In 2019, CAA funds were available for vouchers after HUD issued a Notice of Default to the owner, but HUD did not allow the tenants to move. The tenants remained in conditions of imminent health and safety risks.**

In 2019, Congress provided CAA funds to HUD for vouchers to allow PBRA tenants in housing with imminent health and safety risks to leave and get safe housing elsewhere.[4]

In 2019, the tenants resided in conditions of imminent health and safety risks and these failing housing standards were clearly documented by HUD.[5]

In May 2019, HUD's physical inspection of the conditions at Sandpiper and the accompanying inspection report found that Sandpiper failed to meet HUD housing regulations and found life-threatening deficiencies. HUD gave the owner notice of the specific deficiencies establishing the violations of the HUD contract with the owner in the May 15, 2019, Notice of Default. JA77-81. HUD's inspection gave the project a failing score of 33c out of a possible 100 points. JA90. The report projected 199 life threatening health and safety deficiencies and 535 other

_____

[4] CAA 2019, 133 Stat. at 435-436.

[5] The Sandpiper tenants had been subjected to these conditions prior to 2019. HUD knew of these failing conditions since at least 2016. JA36-38.

deficiencies. JA25. The life-threatening health and safety conditions included systemic deficiencies affecting all quality of living conditions including damaged/missing roof components, leaky plumbing, insect infestations and mold/mildew. There were missing/damaged stoves; inoperable/not lockable windows; inoperable elements of the electrical system; missing/broken electrical outlets; exposed electrical wires and open electrical panels; missing or broken bathroom appliances; broken plumbing; missing/inoperable smoke detectors; and obstructed accessibility/escape routes. JA25. The report contains over 100 pages of deficiencies by unit and building. Dkt.27-4, HUD 2019 REAC report.

A separate HUD Management Review 2019 inspection report of Sandpiper found that the owner refused to install safety measures to deter violent criminal activity, and this refusal increased the risk to residents from serious crimes. JA25-26.

The Notice of Default required the owner to identify and correct the physical deficiencies within 60 days. JA78. The owner did not comply and failed to correct the deficiencies within 60 days. Instead, the owner submitted an Action Plan that HUD approved on September 16, 2019. JA24. The owner's plan was to remedy the deficiencies by selling the project to a "preservation-oriented" owner who would rehabilitate the property by pursuing refinancing for such rehabilitation and preservation of the property. JA22. The owner promised the sale to be in place by

9

the end of 2019. JA86-87. No sale took place at that time. The owner spent no money to correct any of the deficiencies in 2019. JA22.

The Sandpiper tenants requested the CAA voucher assistance from HUD on September 5, 2019. JA82-85. The tenants informed HUD that they wished to be rehoused out of the unsafe and unsanitary conditions at Sandpiper with vouchers and asked for HUD assistance in finding another unit. HUD did not give them vouchers. JA17. HUD's letter in reply to the request for vouchers showed that HUD was considering only two options, both of which involved only rehabilitation of the project. HUD stated unequivocally that "[i]n either case, the residents would be staying in the property pending the completion of rehabilitation, which may take over a year." JA87. HUD continued to pay the Sandpiper owner each month even though the units had failed housing quality standards. JA18, 24-25.

In 2019, HUD did not use CAA vouchers to remove the Sandpiper tenants from the conditions of imminent health and safety risks. JA17.

**C.** **In 2020, CAA funds were available for vouchers, but HUD did not let the tenants move. The tenants remained in conditions of imminent health and safety risks.**

In 2020, Congress again provided CAA funds to HUD for vouchers to allow PBRA tenants in housing with imminent health and safety risks to leave and get safe housing elsewhere.[6]

The Sandpiper residents continued to live in units with imminent health and safety risks throughout 2020. JA25-29, 41-43, 50-52. These conditions remained in effect, and HUD continued to pay the owner each month while the tenants remained in conditions that did not meet HUD's basic housing quality standards and presented conditions that posed imminent risks to the health and safety of the tenants. JA24-25.

One year after HUD issued the Notice of Default, the owner obtained a new management company and made minimal repairs in some units. These minor repairs did not even five of six deficiencies found by HUD in the 2019 Notice of Default. These repairs were so minor that they are less than 1/40th of the cost of the repairs later deemed necessary by the new owner in 2021. JA23. The tenants continued to be subject to missing kitchen appliances and stoves; damaged walls and ceilings,

---

[6] Further Consolidated Appropriations Act, 2020, Public Law 116-94, 133 Stat. 2534, 2976-2977, Dec. 20, 2019 (CAA 2020).

damaged frames, doors, windows; no smoke detectors, mold/mildew and infestation, and the tenants continued to be at risk of violent crime. JA25-29, 41-43, 50-52.

The tenants faced conditions of imminent health and safety risks, the owner was still subject to the HUD 2019 Notice of Default, and 2020 CAA funds were available to HUD to provide vouchers.

On June 30, 2020, Plaintiffs filed suit against HUD for refusing to provide them with vouchers to move away from the uninhabitable conditions that HUD had found over a year earlier with the 2019 Notice of Default to the owner. JA3. The Sandpiper tenants requested relief of CAA vouchers and requested other assistance aside from vouchers to move out of Sandpiper. Dkt. 1, Complaint, page 48.

HUD did not provide any of the Sandpiper residents with vouchers or other assistance to move. JA30.

HUD continued to support the owner's plan of gaining a new owner for the property for rehabilitating the property. JA168.

ITEX, the developer that ultimately purchased the Sandpiper property in 2021 obtained a scope and cost review assessment of Sandpiper in February 2020. This Scope and Cost Review was a survey of the entire project, identifying the corrections for all of the physical deficiencies at the project. JA24. In addition to the deficiencies identified in the 2019 HUD inspection reports, the assessment identified new

12

conditions of imminent health and safety risks at the site - lead contamination and asbestos at the apartments - as deficiencies to be corrected. JA26-29.

In 2020, HUD did not use CAA vouchers to remove the Sandpiper tenants from the conditions of imminent health and safety risks. JA30.

> **D.** **In 2021, CAA funds were available for vouchers, but HUD did not let the tenants move. The tenants remained in conditions of imminent health and safety risks.**

In 2021, Congress again provided CAA funds to HUD for vouchers to allow PBRA tenants in housing with imminent health and safety risks to leave and get safe housing elsewhere.[7]

During 2021, the Sandpiper tenants remained in conditions of imminent health and safety risks. JA25-29, 41-43, 49-55 (Second Amended Complaint); JA246-267 (Declarations). On top of the unaddressed substandard and unlivable conditions, an environmental assessment report found that there were more conditions of imminent health and safety risks to the Sandpiper tenants. The report found the presence of contaminated soil, lead based paint, lead pipes, and asbestos. JA26-28. HUD's own guidance lists known harms from lead, asbestos, mold. JA27, 52.

HUD continued to deny Plaintiffs the relief of vouchers to move out of the conditions of imminent health and safety risks at Sandpiper. HUD's March 8, 2021,

---

[7] Consolidated Appropriations Act, 2021, Public Law 116-260, 134 Stat. 1182, 1869, Dec. 27, 2020 (CAA 2021).

letter to the state bond agency, the Texas State Affordable Housing Corporation (TSAHC) is clear and unequivocal that vouchers are not going to be provided to the Sandpiper tenants. JA31.

> To be clear, when compared to the preservation of the HAP contract as proposed at the Property, **the alternative of issuing vouchers is not a viable nor desirable option.** JA171. (emphasis added).

HUD explained that its decision to not give vouchers was based on HUD's desire to preserve Sandpiper as PBRA housing. JA171. HUD again reported its final decision for not providing vouchers in another letter to the TSAHC. JA32; 174-175. HUD wrote these letters to support the developer seeking bonds to fund a limited rehabilitation of Sandpiper. JA171.

The Sandpiper owner was still subject to the 2019 Notice of Default until the property was sold in October 2021. HUD had not released the 2019-October 2021 owner from the 2019 Notice of Default prior to the sale. JA269-270.

Both prior to the sale in October 2021, and as of the end of 2021, there were CAA funds available for HUD to use as vouchers to remove the Sandpiper tenants from the conditions of imminent health and safety risks.[8] In 2021, HUD did not use CAA vouchers to remove the Sandpiper tenants from the conditions of imminent health and safety risks. JA30-32.

---

[8] CAA 2021, 134 Stat. at 1869.

The CAA funds allocated for voucher assistance for PBRA tenants such as the Sandpiper tenants were available for use in 2019, 2020, and 2021 and continue to remain available for use for voucher assistance.[9]

### E.  Conditions of imminent health and safety risks remain at Sandpiper and will remain even after the proposed rehabilitation.

Four months after the new owner purchased Sandpiper, HUD inspected the property and issued a new 2022 HUD Management Review report that showed the same ongoing uninhabitable conditions that had existed since the 2019 Notice of Default. JA300-307; Dkt. 44-1, Declaration, pages 1-2.

The 2022 HUD report found that "criminal activity at the property continues to be of great concern, as crime is at unacceptable levels and is affecting residents' living conditions and safety." JA302. SHCC concluded that "based on the nearly 50% increase in calls since the 2019 Management report. JA303.

The 2022 report stated that although some deficiencies were corrected, many reoccurred including: evidence of roach infestations, leaking faucets, damaged door hardware and inoperable smoke detectors. The deferred maintenance is another repeat finding from the 2019 Management report. JA304-305. The 2022 report found that the owner has not implemented its Lead Hazard Control Plan. "[w]hile the

_____

[9] Consolidated Appropriations Act, 2019, P.L.116-6, 133 Stat. 13, 435-436, Feb. 15, 2019; Further Consolidated Appropriations Act, 2020, Public Law 116-94, 133 Stat. 2534, 2976-2977, Dec. 20, 2019; Consolidated Appropriations Act, 2021, Public Law 116-260, 134 Stat. 1182, 1869, Dec. 27, 2020.

Owner/ Agent provided a copy of a Lead Hazard Control Plan, no documentation was supplied to confirm that the lead hazard control plan is being followed." As a result, tenants may suffer "an increased risk of lead exposure." JA306-307.

Even with the owner's proposed rehabilitation, HUD found items that affected resident health and safety. Systemic deficiencies were identified by HUD, and HUD required the owner to provide a plan of action for how to remove these deficiencies. JA302-306.

Plaintiffs and Sandpiper tenants continue to reside in conditions of imminent health and safety risks that will not all be addressed by the proposed rehabilitation. JA260-261 and JA264-265. The rehabilitation plan by the new owner does not address the violent crime at Sandpiper. JA302-303. The soil remediation will take several years as will the proposed rehabilitation plan. JA26, 178, 305. The owner does not have a lead hazard removal plan. JA306-307. The state bond agency staff described the "horrific conditions" and wondered how all of these conditions would be addressed:

> The long-term neglect by current and previous owners and property managers of Sandpiper Cove has created poor living conditions for the tenants. Staff has seen horrific conditions in recent months, both firsthand and through live streamed tours. Broken windows, visible mold in bedrooms, rusted and unsafe stoves, leaking faucets, inoperable HVAC systems and failing stair rails were all visible during both in person and virtual tours. These conditions lead us to ask what other choices can be given to the tenants. JA187.

The 2022 HUD inspection report concluded, "While it is acknowledged that the planned substantial renovations may address many of the long-term deficiencies and deferred maintenance, it is also imperative that residents are afforded HUD required decent, safe and sanitary living conditions in their current units while awaiting Renovations." JA305. HUD did not provide tenants with vouchers to leave the property even with these continued inspection findings.

HUD's own guidance acknowledges that the PBRA CAA voucher assistance requested by the Sandpiper tenants may be authorized even when deficiencies identified by HUD will be addressed. HUD's Notice states in referring to the vouchers for PBRA tenants at issue here, "[i]t is possible that in some circumstances the deficiencies will be addressed, and the Section 8 contract will continue, in which case the vouchers would remain relocation vouchers." HUD PIH Notice 2018-09. JA212. There is sufficient housing in Galveston and in the area for tenants to use vouchers to find decent housing. JA46-47, 218. The developer's HUD approved relocation plan is based on the ready availability of homes for vouchers, but HUD did not issue any vouchers for the tenants. JA171-172, 236.

The evidence shows that the likelihood of Sandpiper continuing to fail to provide habitable housing even after the proposed remodel is uncontested. The developer that purchased the Sandpiper property has a poor record of maintaining its subsidized projects. This developer has so many properties across the state with

17

failing housing inspections that the state agency had previously banned this developer from receiving further housing funds. JA179-180, 185-186. HUD inspections found Sandpiper to be a failing property with horrific violent crime for years prior to the 2019 Notice of Default. JA95, 207, 220. The Sandpiper property is in a Black neighborhood, and the uncontested evidence shows HUD knowingly paying for housing in Black neighborhoods in the Galveston area that fail housing quality standards. JA201, 231-234, 243.

### F. White tenants in the majority white PBRA projects in white neighborhoods of the Galveston region are not subject to the failing, substandard housing conditions of the Black area PBRA projects.

It is uncontested that HUD subjects the Sandpiper tenants and the other PBRA tenants at projects in Black neighborhoods of the Galveston area to failing housing conditions. HUD does not subject the white PBRA projects to housing that fails HUD standards. JA201, 231-234, 243.

HUD's own reports show that HUD's continued funding of Sandpiper maintains a pattern of segregated and unequal housing in Galveston and in the area. HUD's inspection reports demonstrate that the uninhabitable conditions exist at Sandpiper while the HUD reports for PBRA projects in white neighborhoods with white tenants provide decent, safe and sanitary housing to those tenants. JA201.

The Sandpiper tenants set out the facts of a prima facie case of disparate treatment. JA55-66. HUD pays for PBRA housing in white neighborhoods in the

Galveston area that is decent, safe, and sanitary. HUD breaches the obligation to provide standard housing for Black PBRA tenants in the Galveston area, including the Sandpiper tenants. JA18, 69, 231-234, 243.

HUD's inspections show that the only PBRA projects in the Galveston/Brazoria area with failing scores are located in predominantly Black census tracts and are predominantly Black and Hispanic occupied. JA233. All of the white area PBRA projects in the Galveston area have passing HUD inspection scores demonstrating compliance with HUD housing quality standards. This uncontested data from HUD's reports is presented by county, by project and by unit and all demonstrates significant discriminatory effect. JA231-234.

HUD's decision to refuse to grant voucher assistance to the Plaintiffs makes decent, safe, and sanitary housing unavailable to the Black Sandpiper tenants that it makes available to white PBRA tenants. JA18, 69, 231-234, 243. HUD pays for PBRA housing in white areas that meets HUD's standards but does not do so in most of the Black area PBRA locations. HUD refuses to provide the voucher assistance that would allow Plaintiffs to obtain available dwellings that would provide equal habitable conditions. JA55-66. HUD is clearly aware of other subsidized housing in Galveston that could be used to house the Sandpiper tenants who seek decent, safe and sanitary housing. HUD has available other housing resources including regular vouchers (not CAA tenant protection vouchers) that could be used to house the

tenants who want to leave the unsafe and substandard housing that has put the tenants and their families at risk. JA46-47.

## II.    Procedural history and the rulings presented for review

The Complaint was filed on June 30, 2020. JA3. Because HUD moved to transfer venue, no responsive pleading was filed until after that motion was denied on June 23, 2021. Dkt. 17, JA4. After two HUD motions to extend the time to respond to the complaint, HUD moved to dismiss the complaint on September 8, 2021. Plaintiffs amended the complaint on September 22, 2021, mooting that motion to dismiss. JA5.

Plaintiffs filed the Second Amended Complaint and filed a motion for preliminary injunction on November 15, 2021. JA5-7. On December 17, 2021, HUD opposed the motion for a preliminary injunction and moved to dismiss the Second Amended Complaint for lack of jurisdiction and for failure to state a claim. JA7.

On May 21, 2022, the District Court denied Plaintiffs' Motion for a Preliminary Injunction and granted HUD's Motion to Dismiss the Second Amended Complaint. JA9. On June 15, 2022, Plaintiffs filed a Motion to Alter or Amend the Judgment and for Reconsideration of the dismissal. JA9. The District Court denied that motion on November 4, 2022. JA10. These are the two rulings presented for review. JA308-341, 353-359.

## SUMMARY OF THE ARGUMENT

Senator Marco Rubio proposed and Congress continues to appropriate funding for HUD to provide PBRA tenants with rental assistance vouchers to escape hazardous units where HUD has issued a Notice of Default because of the owner's breach of the obligation to provide decent, safe and sanitary housing and the units pose an imminent health and safety risk to residents. There are no other prerequisites for HUD's issuance of the assistance.[10] Senator Rubio's appropriation proviso is intended to fund tenant protection vouchers for tenants to access habitable housing while HUD navigates its enforcement process against the owner. 162 Cong. Rec. S2946 (May 18, 2016) (statement Sen. Rubio). Plaintiff Tenants' circumstances meet the very objective of this allocation and satisfy the provision authorizing the expenditure for tenant protection vouchers under each year's appropriation proviso. Yet, HUD made the final decision to withhold that relief precluding Plaintiffs from obtaining decent, safe, and sanitary housing.

Plaintiffs' APA claims challenging this decision are not moot because the relevant appropriation statutes make the funding from each appropriation year available for the Court to grant effectual relief to Plaintiffs' injuries by finding HUD's decision constitutes an abuse of discretion and remanding that decision back

---

[10] *See, e.g.,* Consolidated Appropriations Act, 2021, Public Law 116-260, 134 Stat. 1182, 1869, Dec. 27, 2020.

to the agency for a potential outcome in Plaintiffs' favor. The statutes include 31 U.S.C. §§ 1502(b), 1552(a), 1553(a), (b). 1 U.S. Government Accountability Office, Principles of Federal Appropriations Law, pages 5-71, 5-72, 5-74, 5-88 (3d ed. 2004) (explaining availability of appropriations funds under these statutes). These principles were applied to reverse a HUD supported District Court dismissal based on mootness in *Westchester v. U.S. Dept. of Hous. and Urb. Dev.*, 778 F.3d 412, 417, 417 n.8 (2d Cir. 2015). The District Court ignored these statutes. JA308-341, 353-359. The District Court ignored the equitable principle supported by the statutes that past appropriations are still available for judicial relief. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98 (D.C. Cir. 2021).

The Congressional use of the present perfect tense in the language setting the requirements for the CAA proviso relief contradicts HUD's argument that its actions resulting in the sale of the property to a new owner in October 2021 makes the proviso relief unavailable. Had Congress intended this result it would not have used the present perfect tense in describing the owner as one that "has received" the Notice of Default. The use of the present perfect tense in "has received" a Notice of Default continues to be true. The owner of the property in 2019, 2020, and through September of 2021 is an entity that "has received" the Notice of Default. The use of the present perfect tense evinces Congress' intent to include any previous events such as receiving a Notice of Default to be within the ambit of the CAA provision and

includes Notice of Default received in the indefinite past. The use of the present perfect tense includes actions that take place in the past and reach into the present. *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010). Only by using the present tense would Congress have shown its intent to exclude the locations where past owners were the recipients of a Notice of Default. An owner who "receives" a Notice of Default could be a present owner. An owner who "has received" a Notice of Default includes owners who received a Notice of Default in the past. For example, *Carr v. U.S.*, 560 U.S. 448 (2010) held that a person described by the present tense "travels" would not include a person described by a tense such as present perfect that refers to the travel as occurring in the past. The only present tense verb in the proviso is "pose" in the requirement "the units pose an imminent health and safety risk to residents: CAA 2019, 133 Stat. at 436.

The District Court erred in concluding that Plaintiffs failed to meet the "capable of repetition yet evading review" exception to mootness. Plaintiffs satisfied both elements of the doctrine. *J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020). The District Court failed to apply the correct legal standard to the first element. Plaintiffs' motion for preliminary injunction would not have had sufficient time to have fully been litigated through appeal to the Supreme Court. Plaintiffs met the second element- that there is a reasonable expectation that Plaintiffs will continue to be subjected to the same actions. As of February 2022, there is uncontradicted

evidence that the units continue to pose health and safety risks per HUD's own inspection reports. JA300-307. These facts show the probability that the new owner will be found in default of the HAP contract.

In addition, Tenants' Second Amended Complaint pled facts demonstrating that HUD is treating similarly situated Black PBRA tenants differently from white PBRA tenants in the Galveston area. Black PBRA tenants are forced to endure substandard housing while white PBRA tenants are not subject to these conditions. The conditions at the similarly situated majority white PBRA projects are decent, safe, and sanitary without imminent risks to the health and safety of the residents. JA59-60, 231-234, 243. This dual segregated PBRA housing is funded and supported by HUD.

The District Court failed to address Plaintiffs' intentional discrimination claims requesting relief to access habitable housing asserting that the only relief sought for these claims was the CAA proviso relief. JA339-340. Plaintiffs pleaded for relief apart from CAA vouchers including the assistance to relocate to decent housing. JA69. The District Court had the authority to provide relief to Plaintiffs by ordering HUD to provide voucher assistance through its traditional Section 8 voucher program or by ordering HUD to provide assistance to Plaintiffs at other habitable PBRAs in the Galveston area. HUD has the authority to "(I) take any other regulatory or contractual remedies available as deemed necessary and appropriate

24

by the Secretary." CAA 2021, Sec. 219(c)(2)(I). HUD's contract enforcement regulation provides that the enforcement process does not prevent HUD from taking "whatever action may be necessary . . . to protect the residents of these properties." 24 C.F.R. § 200.857(i)(4). This provides for a wide range of relief in addition to the CAA tenant protection voucher proviso that is available for intentional discrimination remedies. In any case, the District Court had jurisdiction to provide effectual relief to remedy Plaintiffs' intentional discrimination claims.

The District Court mentioned, without holding, that the tenants' claims for CAA tenant protection vouchers could not redress the claims because such vouchers were left to HUD's discretion. The APA, 5 U.S.C §706(2), creates the presumption of judicial review of HUD's arbitrary and capricious decision to leave tenants in severely substandard housing instead of using available appropriations to move them to safety. *Weyerhaeuser Co. v. U.S. Fish and Wildlife Service,* 139 S. Ct. 361, 370 (2018). Redressability is established.

Because effectual relief is available, the case is not moot. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Judicial relief can be awarded. The court's power to remedy Plaintiffs' injuries with a remand order declaring HUD's withholding of relocation assistance arbitrary, capricious and contrary to the law is sufficient to defeat mootness.

## ARGUMENT

### I.     Standard of Review

The standard of review on appeal of a dismissal based on Fed. Rule 12(b)(1) is de novo. *Abuzeid v. Mayorkas*, 2023 WL 2543024, at *4 (D.C. Cir. 2023); *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1250 (D.C. Cir. 2005). The allegations in Plaintiffs' complaint must be accepted as true.  *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C.Cir.2008).

Each of the issues presented is subject to de novo review.

### II.     The sale of the property did not moot the Tenants' claims under the CAA provisions for voucher assistance for units that currently pose an imminent health and safety risk to residents after a Notice of Default with respect to the property

#### A.     The District Court erred in holding that the case was moot.

A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party," *Knox v. Service Employees*, 567 U.S. U.S. 298, 307 (U.S. 2012). If the parties "have a concrete interest, however small, in the outcome of the litigation, the case is not moot. *Chafin*, 568 U.S. at 172. The party urging mootness bears the "heavy burden" of establishing that the case is moot. *Zukerman v. United States Postal Service*, 961 F.3d 431, 441 (D.C. Cir. 2020).

The specific context of the District Court's mootness ruling involves the effect of litigation on the availability of funds under relevant Consolidated Appropriation Acts. The District Court held that the availability of all CAA funding under 2019,

2020, and 2021 was mooted by the change of ownership in October 2021. JA322-328. The District Court held the case was moot based on a single finding of fact that HUD had no legal authority to grant the Tenants' request for vouchers under any CAA even those covering the years when it is uncontested that the Sandpiper Apartments met the requisites for the voucher funding. It is uncontested that Sandpiper was a property where each of these facts were true: 1) units were assisted under a project-based subsidy contract; 2) where the owner during all of 2019, all of 2020, and ten months of 2021 was an owner that has received a Notice of Default; and 3) the units pose an imminent health and safety risk to residents. JA322-328. This was legal error.

### B. Payment for claims accruing during the period of an appropriation act is not mooted by the end of the period for which the funds are appropriated.

There are several applicable statutes that make funding under an appropriation act available after the end of the appropriation year: 31 U.S.C. § 1552(a) and 31 U.S.C. § 1553(a), (b). An appropriation is available for obligation until the end of the fifth fiscal year after the initial period of availability. 31 U.S.C. § 1552(a). In this case, the unobligated 2019 funds remain available until 2024, the unobligated 2020 funds remain available until 2025, and the unobligated 2021 funds remain available until 2026. Each appropriation "shall retain its fiscal-year identity and remain available for recording, adjusting, and liquidating obligations properly chargeable to

27

that account." 31 U.S.C. § 1553(a). Even after the five-year period, obligations that would have been properly chargeable to the appropriation account may be charged to any current appropriation account of the agency available for the same purpose subject to a cap of one percent of the total appropriation for that account. 31 U.S.C. § 1553(b)(1), (2).

A party in litigation may access unobligated allocation funds under 31 U.S.C. §1502(b). The court can provide access to the parties in this litigation to the unobligated balance of the CAA funds for each year from 2019-2021.

In addition, 31 U.S.C. § 1502(b) states that a provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance. The accepted GAO Redbook authority explains the interplay of these statutory provisions in the context of pending litigation. 1 U.S. Government Accountability Office, Principles of Federal Appropriations Law, pages 5-71, 5-72, 5-74, 5-88 (3d ed. 2004). These principles were applied to reverse a HUD supported dismissal based on mootness in *Westchester v. U.S. Dept. of Hous. and Urb. Dev.*, 778 F.3d 412, 417, 417 n.8 (2d Cir. 2015). *Westchester* applied 31 U.S.C. § 1552(a) and 1553(a) to find the case was not moot based on the availability of past years' unobligated appropriations from past fiscal years. *Id.* In the instant case HUD did not attempt to show that either

28

there were no unobligated funds available for the five-year periods after each of the applicable fiscal years or that the total charges for the CAA voucher relief requested in the case would exceed an amount equal to one percent of the subsequent total appropriations for that account. JA268-272, Dkt. 36, Motion to Dismiss, all pages; Dkt. 42, Reply to Opposition to Motion to Dismiss, all pages.

As a general matter, administrative agencies have the obligation to maintain separate balances of obligated and unobligated appropriations. 1 U.S. Government Accountability Office, Principles at page 5-72. HUD did not argue that the 2019 and 2020 appropriation funds and requirements lost any separate identity based on the application of 2021 appropriation. Dkt. 36. Motion to Dismiss, all pages; Dkt. 42, Reply to Opposition to Motion to Dismiss, all pages. HUD bears the heavy burden of establishing the mootness and did not supply that information.[11] *Zuckerman*, 961 F.3d at 441. The District Court's opinion makes a general statement that it could not order HUD to violate an act of Congress nor order HUD to pay money without an appropriation and therefore the new ownership makes the case moot. JA332. The statement is contradicted by the provisions set out in these statutes governing

_____

[11] Publicly available information from a government website concerning spending of appropriations shows available, unobligated PBRA funds. The USAspending.gov website shows that unobligated PBRA funds remain available each year from 2019 through the present. https://www.usaspending.gov/federal_account/086-0303

appropriations and an equitable doctrine that parallels the effects of those provisions as set out below.

Even if the CAA voucher funds had been spent for 2019, 2020, and 2021, the tenants could have access to appropriations funds for the relief of vouchers pursuant to 31 U.S.C. § 1553(b). The GAO Redbook explains the effect of 31 U.S.C. §1553(b) in such a situation and how current appropriations could be used:

> If a valid obligation arises after the appropriation account is closed, section 1553(b) authorizes payment of the obligation from current appropriations if account records show that sufficient funds remained available to cover the obligation when the account was closed by operation of law.  1 U.S. Government Accountability Office, Principles, page 5-88

The amount would be limited per §1553(b)(2). CAA funds for these tenant protection vouchers for PBRA tenants continue to be allocated each year and are available for Sandpiper tenants. *See, e.g.,* Consolidated Appropriations Act, 2023, Public Law 117-238, 136 Stat. 4459, 5143, December 29, 2022 (CAA 2023); Consolidated Appropriations Act, 2022, Public Law 117-03, 136 Stat. 49, 729, March 15, 2022 (CAA 2022).

### C.   There is also an equitable principle supported by 31 U.S.C. § 1502(b) that applies to prevent mootness.

This Court recognizes the existence of the equitable doctrine in the appropriations context for parties in litigation. This Court recently explained the doctrine:

In the appropriations context, our court has recognized "an equitable doctrine . . . that permits a court to award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted on or before that date. *Shawnee Tribe*, 984 F.3d at 98.

The GAO Redbook recognizes and explains this doctrine and the statutory support for the doctrine in 31 U.S.C. § 1502(b). The GAO Redbook states that the status of lawsuits or rights of action involving the right to an amount payable from the balance of an appropriation is not affected even by a law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury. 1 U.S. Government Accountability Office, page 5-88. Given the statutory principle in 31 U.S.C. § 1553(a) that each appropriation retains its own fiscal year identity, this doctrine also prevents the subsequent change in ownership of the Sandpiper Apartments from mooting the Tenants' claims based on the availability of appropriated funds for fiscal years up to and including 2021. The Tenants' claims against HUD were filed in 2019, before the expiration date of the 2019, 2020, and 2021 CAA appropriations. JA1, 3. The equitable doctrine applies to allow HUD to provide the Tenants with tenant protection vouchers. *Shawnee Tribe*, 984 F.3d at 98-99.

**D.    The specific wording of the CAA provision shows that the 2021 change in ownership did not moot the Tenants' claims under the relevant appropriations.**

The CAA provision sets three factual predicates in the text for issuance of the vouchers. 1) the units under the PBRA contract must be in a location **"where"** the owner 2) **"has received"** a notice of default and the 3) **"units pose" an imminent health and safety risk**. CAA. 2021, PL 116-260, December 27, 2020. 134 Stat 1182. (emphasis added). The undisputed facts show that each of these predicates were met. It is undisputed that the units under the PBRA contract were in a location where the following facts had occurred in the past and the effects continued to the present. The only location involved is the Sandpiper Cove Apartments (also known as Compass Pointe Apartments), **where** the owner was given Notice of Default based on the inspection report showing that the units were not in decent, safe, and sanitary condition. JA77. The report estimated the existence of 878 health and safety deficiencies, and 199 life threatening deficiencies. JA35. The conditions at the time of the notice and continuing through at least February 18, 2022 posed imminent health and safety risks to residents. JA94 (score of 33 out of 100 points in 2019); JA202-206 (2021 assessment report showing contaminated soil, lead paint and asbestos on the premises) JA301-307 (high crime risks, units with unsafe and other wise failing decent and sanitary conditions, no implementation of a lead-based paint control program). In 2021, Tenants continued to reside in hazardous conditions

32

present at the complex. JA.257, 261. A subsequent environmental site assessment report documented the presence of contaminated soil, lead paint and asbestos on the premises that posed additional imminent health and safety risks to tenants. JA202-206.

The "where" under the text of the CAA has not changed. The "where" is still the Sandpiper Cove Apartments property (also known as Compass Pointe Apartments). The units still pose imminent health and safety risks to residents. The use of the present perfect tense in "has received" a Notice of Default continues to be true. The owner of the property in 2019, 2020, and through September of 2021 is an entity that "has received" the Notice of Default. The use of the present perfect tense evinces Congress' intent to include any previous events such as receiving a Notice of Default to be within the ambit of the CAA provision includes a Notice of Default received in the indefinite past. *See e.g., Dobrova v. Holder*, 607 F.3d at 301 (the use of the present perfect tense in the statute referred to a previous legal admission to the country even though the most recent entry had not been legal).

The District Court's interpretation incorrectly and explicitly rejects the first condition of "where" in the CAA and is error. JA324-325. The present perfect tense includes "a past action that comes up to and touches the present." *Dobrova*, 607 F.3d at 301, citing Chicago Manual of Style ¶ 5.119 (15th ed.2003). That describes the facts for the tenants from 2019 through 2021 and the CAA requisites had been met.

Congress specifically used this tense so that the tenants currently living in conditions posing imminent health and safety risks could use the vouchers to obtain decent housing.[12]

Had Congress meant to exclude situations where only a present owner was the recipient of a Notice of Default, it would have used the present tense. The present perfect tense does not exclude past instances of the conduct described. Only by using the present tense would Congress have shown its intent to exclude the locations where past owners were the recipients of a Notice of Default. An owner who "receives" a Notice of Default is a present owner. An owner who "has received" a Notice of Default includes owners who received Notice of Default in the past. For example, *Carr v. U.S.*, 560 U.S. at 448 held that a person described by the present tense "travels" would not include a person described by a tense such as present perfect that refers to the travel as occurring in the past. Use of the present perfect tense shows Congressional intent to denote a wide time range covering both past and present conditions. *Emerald Mines Co. v. Fed. Mine Safety and Health Rev. Commn.*, 863 F.2d 51, 56 (D.C. Cir. 1988).

―――――――――

[12] The legislative history for Senator Rubio's amendment is at TRANSPORTATION, HOUSING AND URBAN DEVELOPMENT, AND RELATED AGENCIES APPROPRIATIONS ACT, 2016-Continued, Congressional Record May 18, 2016 – Issue: Vol. 162, No. 79 – Daily Edition, 114th Congress (2015-2016) – 2nd Session, S2935, S2944-S2946, Rubio Amendment 3986 (May 18, 2016) (Senator Rubio Senate Floor Speech)- cited in this brief as 162 Cong. Rec. S2946 (May 18, 2016).

**E.    The Notice of Default was issued with respect to the Sandpiper property and continues to apply to the property.**

The Notice of Default is for the Sandpiper property and continues to apply to the property after the new owner purchased Sandpiper. The Notice of Default starts with the following:

SUBJECT: Notice of Default of the Housing Assistance Program

Project Name: Compass Pointe Apartments Texas

Project Location: 3916 Winnie Street, Galveston, TX 77550

HUD HAP Contract Number: TX24M000018

HUD IREMS Number: 800021321. JA77.

There can be no doubt that the Notice was issued with respect to the Project named Compass Pointe Apartments located at 3916 Winnie Street, Galveston, TX 7750 with HUD HAP Contract Number TX24M000018. The Notice of Default made it clear that the project was inspected and that the project received the failing score of 33c*. JA77.

The suggestion that the CAA provision does not permit the issuance of vouchers where a Notice of Default has been issued with respect to the property does not take into account the specific wording of the provision.

> Provided further, That the Secretary may provide section 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract funded under the "Project Based Rental Assistance" heading under this title where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents. CAA 2019, 133 Stat. at 436.

35

Once the location, "where", is taken into consideration, Sandpiper Cove is a place accurately described as a property where, in the past, the entity owning the property received a "Notice of Default." The Sandpiper Cove units assisted under a project-based subsidy contract funded under the "Project-Based Rental Assistance" heading are undeniably a place "where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents." The fact that there is now a second owner of the property where the past owner "has received" a Notice of Default does not revoke the Secretary's authority to issue the voucher assistance. Congress inserted only one requirement for the provision of the assistance that is stated to be subject to an ongoing and present condition. The only present tense verb in the provision is the requirement that the units continue to "pose an imminent health and safety risk to residents." CAA 2019,133 Stat at. 436.

The enforcement provisions in a separate section of the CAA support the continuation of the Notice of Default that a past owner "has received." One of the enforcement options for an owner's failure to correct all deficiencies set out in the Notice of Default is the enforcement option chosen by HUD in this case. The statute provides that if at the end of the time period specified in the Notice, all deficiencies have not been fully corrected, HUD may:

> (D) pursue transfer of the project to an owner, approved by the Secretary under established procedures, who will be obligated to promptly make all required repairs . . . . CAA 2021, 134 Stat. at 1898, Sec. 219(c)(2)(D).

The owner accepting transfer of the project must make "all required repairs" under the issued notice of default. The transfer to a new owner other than the one who "has received" a Notice of Default also transfers the obligations under the Notice of Default. The transfer does not end the current effects of the Notice of Default for the property where the prior owner has received such a Notice. The purchaser of the property has taken over the HAP contract and has agreed to accept the assignment of and assume all obligations under the HAP Contract. JA33-34, 281. The HAP requires the property to be decent, safe, and sanitary and in compliance with HUD regulations. JA33-34. It is uncontested that these conditions were not met at the time of the purchase or four months later according to HUD's inspection. JA300-307. HUD's refusal to issue a new notice of default to this owner is part of the evidence of the arbitrary and capricious behavior complained of by the tenants in this case.

## III.   The CAA does not require a pending enforcement action for vouchers to be issued.

The District Court ruled that HUD's declaration that the enforcement action against the previous owner was concluded was another factor showing mootness. JA326. This was legal error. The CAA process is specifically set up to be separate from the contract enforcement process. Senator Rubio's introduction to the amendment setting up the process specifically contrasted it to the contract enforcement process and proposed it as a means of providing quicker relief than that

process and as an alternative to contract termination. 162 Cong. Rec. at S2946 (May 18, 2016) (statement Sen. Rubio).[13]

HUD's contract enforcement regulation provides that the enforcement process does not prevent "whatever action may be necessary . . . to protect the residents of these properties." 24 C.F.R. § 200.857(i)(4). HUD's own guidance specifically recognizes the CAA process as outside of and in addition to the contract enforcement procedures. JA212, HUD Notice PIH 2018-09. The vouchers may be issued without regard to whether the contract has been terminated and may continue in use even if the deficiencies are corrected. JA212.

---

[13] Senator Rubio announced the purpose of the tenant protection vouchers for PBRA tenants in uninhabitable conditions like those the Sandpiper tenants face:

> The last amendment I filed is Rubio amendment No. 3986, and it is to make temporary relocation assistance available for residents in situations such as those I have just described. This amendment would make tenant protection vouchers available for tenants living in units where the owner has been declared in default of a HUD Housing Assistance Payments contract due to physical deficiencies, allowing the Secretary to consider granting tenant relocation vouchers sooner in the process.

> The lack of temporary relocation assistance has kept these tenants trapped in Eureka Gardens. . . .

> One of the things we hear from HUD is: Well, we can take away the contract, but then what happens to all these people? We don't want to do that, and slumlords like Reverend Hamlet and his group know they can get away with this as a result. 162 Cong. Rec. at S2946 (May 18, 2016).

The text and structure of the CAA reinforce the existence of the tenant protection voucher process as outside of and independent of the PBRA contract enforcement procedure. The tenant protection voucher is established under the section setting out the uses of the funds appropriated. CAA 2021, 134 Stat. at 1869; CAA 2020, 133 Stat. at 2976-2977; CAA 2019, 133 Stat. at 435-436.The PBRA enforcement procedures are set out in a subsequent, specifically numbered section 219. CAA2021, 134 Stat. at 1897-1898§ 219(b), (c); CAA 2020, 133 Stat. at 3005-3006, § 219 (b), (c). This CAA section 219 sets out those enforcement procedures. The tenant protection vouchers are not included in that enforcement process and are in a different section of the CAA. The continuation or the cessation of the enforcement process is not included as a factor in the CAA tenant protection vouchers process. If the imminent risks to the health and safety of the tenants have not been eliminated by any or all enforcement actions, the units assisted where the Notice of Default was given are eligible for the CAA voucher assistance. The HUD declaration that enforcement is ended does not moot the issue whether tenant protection vouchers should be issued because it is irrelevant under the CAA provision allowing for the issuance of such vouchers.

IV.   **It was error to hold the tenants' discrimination claims were moot because of the sale of the property because the tenants sought other relief aside from CAA tenant protection vouchers.**

A.   **HUD is providing different standards of housing to similarly situated PBRA tenants based on race.**

The Sandpiper tenants set forth the uncontested facts of a prima facie case of disparate treatment based on their race that gives rise to an inference of discrimination by HUD. Plaintiffs are Black. The units at Sandpiper are occupied by 89% Black and Hispanic households. The units are 76% Black occupied. JA59. Sandpiper is located in a predominantly Black and Hispanic neighborhood. JA58. The Sandpiper tenants and other Black and Hispanic PBRA Galveston area tenants are disproportionately subject to substandard and failing housing conditions compared to white PBRA tenants. JA59-62. The conditions at the similarly situated majority white PBRA projects are decent, safe, and sanitary without imminent risks to the health and safety of the residents. JA59-60, 231-234, 243.

HUD's withholding of any and all relief prevents Black and Hispanic Sandpiper tenants from accessing decent, safe and sanitary units. White PBRA tenants do not need access to voucher relief because they currently live in decent, safe and sanitary HUD subsidized units. JA57, 231-234, 243. This dual PBRA housing system funded by HUD violates the Equal Protection clause, the Fair Housing Act and perpetuates racial segregation in violation of HUD's duty to affirmatively further fair housing. JA55-69.

40

**B.     The Second Amended Complaint sought relief other than just CAA vouchers. This requested relief makes the case not moot.**

The District Court dismissed the discrimination claims on mootness grounds. The court stated that since the only relief available that had been effectively pled was CAA vouchers, the discrimination claims were moot because those CAA vouchers were unavailable based on the sale to the new owner. JA337-340. This was error. Plaintiffs pled relief apart from CAA vouchers including assistance to relocate to decent housing. JA69. HUD can provide this relief since HUD has the authority to make other housing available, such as regular vouchers or other PBRA units.

Plaintiffs pled facts demonstrating that HUD is administering two separate systems of housing based on race. Plaintiffs' concrete interest in this litigation is to access habitable housing in integrated neighborhoods. Plaintiffs requested such relief including:

> an injunction ordering HUD to provide Plaintiffs with the assistance necessary to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions for so long as Plaintiffs remain eligible for the assistance. JA69.

The District Court had the authority to award relief under the traditional voucher program (unrelated to the CAA vouchers) to redress the discrimination claims. A desegregation remedy to HUD's discrimination in housing can use various federal housing programs available. *Hills v. Gautreaux*, 425 U.S. 284, 301 (1976) (An order directing HUD to use its discretion under the various federal housing programs for

41

housing located in white areas is an effective desegregation remedy); *Clients' Council v. Pierce*, 711 F.2d 1406, 1426 (8ᵗʰ Cir. 1983) (remedy is to promptly desegregate HUD housing and is not to be conditioned on HUD allocating funds for housing); *Walker v. HUD*, 734 F. Supp. 1231, 1271 (N.D. Tex. 1989) (vouchers could be used in remedy to desegregate public housing). Plaintiffs' race discrimination claims are not moot because effectual relief is available to redress their injuries. *Knox*, 567 U.S. at 307.

Plaintiffs plausibly pled the availability of the alternative relief other than CAA vouchers. The Second Amended Complaint has three pages showing the other available federally assisted housing in Galveston that could have been used to move tenants to habitable housing without a CAA voucher. JA46-48. Plaintiffs pled the facts of other PBRA units in white areas with housing that meets HUD standards that could have been used to relocate the Sandpiper tenants. JA59-62. Instead of using the other available housing, HUD chose to leave the Sandpiper tenants in life-threatening conditions. HUD also has the authority to "(I) take any other regulatory or contractual remedies available as deemed necessary and appropriate by the Secretary." CAA 2021, 134 Stat. at 1898, Sec. 219(c)(2)(I). HUD's contract enforcement regulation provide that the enforcement process does not prevent HUD from taking "whatever action may be necessary . . . to protect the residents of these properties." 24 C.F.R. § 200.857(i)(4). This provides for a wide range of relief in

addition to the CAA provisos that are available for intentional discrimination remedies.

### C. Plaintiffs' intentional discrimination claims for CAA voucher relief are not moot.

As addressed earlier, Plaintiffs meet the CAA elements for vouchers. Despite the sale of Sandpiper Cove to the new owner, the deficiencies in the 2019 Notice of Default have not been cured. Tenants remain trapped in units posing imminent health and safety risks. The court can grant relief to Plaintiffs that are subjected to substandard housing based on race by ruling that HUD's refusal to provide CAA voucher relief that allows access to integrated, habitable housing is arbitrary and capricious and an abuse of discretion. The authority and argument that the issue is not otherwise moot is set out at pages JA346-350.

While a judicial remand declaring HUD's decision to withhold voucher relief an abuse of discretion may not be fully satisfactory, it is sufficient relief for Plaintiffs' race discrimination claims to survive mootness. *Chafin*, 568 U.S. at 177.

### V. The record demonstrates that the conditions at the Sandpiper complex meet the "capable of repetition" exception to mootness especially given the likelihood that the complex will continue to pose imminent health and safety risks to the tenants.

The "capable of repetition but evading review exception" to mootness is met in this case because the action evaded review and the legal question is reasonably likely to recur. The exception applies if the 1) challenged action was in its duration

43

to short to be fully litigated prior to its cessation and 2) there was a reasonable expectation that the same complaining party would be subjected to the same action again. *J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020).

The District Court held that the first element had not been met by finding that the decision to issue vouchers prior to the change in ownership was not too short to be fully litigated. JA330-331. The District Court stated that the tenants had sufficient time to file and litigate a preliminary injunction motion prior to the change in ownership. The District Court erred by applying the incorrect standard. The standard for evading review is whether the challenged action must be incapable of surviving long enough to undergo Supreme Court review. *J.T.*, 983 F.3d at 523.

Any preliminary injunction motion filed after the complaint had been filed would not have had sufficient time for those proceedings to have fully been litigated through appeal to the Supreme Court. The case was filed in June 2020. JA3. HUD moved to transfer venue on October 30, 2020, and did not respond to the complaint until September 2021 after the venue motion had been decided on June 23, 2021. JA4. HUD moved to dismiss the complaint, fifteen months after the complaint was filed and right before the sale of the property. JA5. Judicial review through trial, appellate and Supreme Court review routinely take more than fifteen months to complete. *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. D.C.,* 972 F.2d 365, 369–70 (D.C. Cir. 1992).

The second element for the "capable of repetition" exception to apply is clearly established because there is a reasonable likelihood that the legal issue will be the basis of a continuing controversy. *J.T.*, 983 F.3d at 524. The record facts establish that the substandard housing conditions at Sandpiper will be a recurring problem even with the proposed rehabilitation plan. *See supra*, Statement of the Case, facts at Section I.E. Conditions of imminent health and safety risks continue to plague the tenants, and HUD is likely to issue a Notice of Default to the new owner since HUD's 2022 inspection shows the unmitigated conditions from previous failed inspections still existing. JA297-298, 303-305. It is reasonable that the tenants will again request vouchers under the current CAA year.

The record shows that in February 2022, months after the change in ownership, HUD's new inspection revealed that the conditions of imminent health and safety risks remained including the failure to implement lead hazard control measures and the failure to adequately protect the tenants from violent crime. These recurring conditions included ongoing health and safety deficiencies identified from the previous 2019 Notice of Default. JA303-305. There are specific conditions of imminent health and safety risks that will not be included in the proposed rehabilitation such as crime not listed on the scope of rehabilitation work. JA180, 194-195.

45

It is reasonable to expect that the new owner will be issued a notice of violation for these recurring conditions. Sandpiper has been failing to comply with HUD housing regulations since at least 2016. JA36-38. The new owner has a history of failing to maintain its subsidized properties. JA179-180; s*ee supra,* Statement of the Case, Section I.E. The probability of Sandpiper experiencing deferred maintenance and ongoing failing housing conditions is evidenced by the history of this majority-Black project. The high probability is demonstrated by the uncontested evidence showings that Black PBRA tenants such as the Sandpiper tenants disproportionately reside in substandard housing conditions compared to white PBRA tenants and that it is likely to recur. JA201, 231-234, 243.

Congress each year since Sen. Rubio added it in 2017 has provided CAA tenant protection vouchers for PBRA tenants in this specific situation where the PBRA tenants are living in units that pose imminent health and safety risks.[14] The legal issue of HUD withholding the relief of vouchers is reasonably likely to continue.

---

[14] CAA 2023, 136 Stat. at 5143; CAA 2022, 136 Stat. at 729; CAA 2021, 134 Stat. at 1869; CAA 2020, 133 Stat. at 2976-2977; CAA 2019, 133 Stat. at 435-436; Consolidated Appropriations Act, 2018, Public Law 115-141, 132 Stat. 348, 1010, March 23, 2018 (CAA 2018); Consolidated Appropriations Act, 2017, Public Law 115-31, 131 Stat. 135, 760-761, May 5, 2017 (CAA 2017).

## VI.    The District Court erred in finding that the redressability element of standing is not present

The trial court opined without deciding that Plaintiffs' APA claim raises a redressability problem. JA332-334. The District Court suggested that the agency's decision to issue vouchers was a prosecutorial decision, suggested that the lump sum appropriation gave no standards for a court to apply judicial review and suggested that since the complaint fails to identify any mandatory duty if the case is remanded to the agency, the tenants' claims are not redressable. JA332-334. The Court did not reach the point of deciding whether existing precedent compels dismissal for lack of standing as it concluded that Plaintiffs' APA claims are moot. JA334.

In discussing whether the tenants have standing, the Court cited *Marino* for the proposition that the decision to issue vouchers is a prosecutorial decision by the agency. *Marino v. Natl. Oceanic and Atmospheric Administration*, 33 F.4th 593 (D.C. Cir. 2022). JA332-334.

The District Court compares the decision that HUD can make with the CAA vouchers to the National Marine Fisheries Service's decision to enforce permit conditions to a prosecutorial decision left to the agency. JA333. This is incorrect. Providing tenant protection vouchers under the Consolidated Appropriations Act is not an enforcement action committed to agency discretion. As explained by the drafter of this section, Senator Rubio, the CAA allows for HUD to provide the vouchers for PBRA tenants when the conditions of a notice of default have been

47

issued and the tenants are residing in units that pose imminent health and safety risks. 2016 Cong. Rec. S2946 (May 18, 2016). Congress specifically put these special vouchers into the CAA to allow HUD to get tenants out of terrible living conditions while HUD separately pursued any enforcement with the owner. HUD's enforcement options for when an owner is in default of providing decent, safe, and sanitary housing are set out in a different section of the CAA, Sec. 219, separate and apart from the vouchers. See, e.g., CAA 2021, 134 Stat. at 1897-1898, § 219(b), (c); CAA 2020, 133 Stat. at 3005-3006, §219 (b), (c).

The District Court is incorrect that the CAA voucher provision at issue is without guidance for the agency to implement. JA333. Unlike *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993), the CAA statute in this case provides meaningful standards for the provision of the vouchers against which a court may judge the agency's exercise of discretion. It is not a lump sum appropriation as there are factors to guide the issuance of the vouchers for the PBRA tenants. In this case, as in *Shawnee Tribe*, Congress has "circumscribed agency discretion to allocate resources by putting restrictions in the operative statute." 984 F.3d at 100. HUD can only provide the CAA vouchers when those restrictions are met.

The District Court is incorrect that a mandatory duty to issue the CAA vouchers is required for the tenants to be able to sue. JA333-334. The APA creates a basic presumption of judicial review for persons suffering legal wrong because of

agency action. *Weyerhaeuser Co.*, 139 S. Ct. at 370. Even if the statute provides the agency with discretion to act, this agency decision may be challenged as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and set aside by a court pursuant to 5 U.S.C. § 706(2)(A). *Id.*

By prevailing on the merits, plaintiffs will have shown that HUD's withholding of relief constitutes abuse of discretion and that they merit relief. Furthermore, judicial deference to agency discretion on remand cannot defeat redressability to eliminate standing. Courts should limit the scope of their remand orders to respect agency discretion, but agencies, in their turn, must of course give respect to those remand orders. The law-of-the-case doctrine and mandate rule require an "administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." § 8381 Vacation and Remand of Agency Action, 33 Fed. Prac. & Proc. Judicial Review § 8381 (2d ed.).

Even though a remand of HUD's decision to withhold vouchers from Plaintiffs is not guaranteed to result in a decision awarding vouchers, a remand could result in substantive outcome in their favor. This is effective relief preventing the case from being moot. *Chafin*, 568 U.S. at 177. The District Court confused mootness with whether the tenants established a right to recover. Rather than continuing to litigate the merits, HUD could choose to issue the requested vouchers, at which point

the matter would be moot. Alternatively, the Court could find that the poor physical condition of the property warrants relief. Mere uncertainty about the practical impact of a decision on the merits does not render the dispute moot. *Id.* at 175. Since a remand could result in a favorable substantive outcome, the case is not moot.

**VII. The District Court erred in denying the Motion for Preliminary Injunction based on lack of jurisdiction over Appellants' claims on the merits.**

The tenants filed a motion for preliminary injunction. JA74-76. The District Court denied tenants' motion for preliminary injunction on one and only one ground – "because the Court lacks jurisdiction to consider Plaintiffs' claims on the merits." JA 341. The Court's ruling that it lacked jurisdiction was based on its conclusion that Tenants' "APA claims are now moot, and the Court, accordingly, will dismiss those claims for lack of jurisdiction. JA323. The non-APA claims were dismissed because the tenant protection voucher claim was moot even though other relief was sought. JA338. This was error because Tenants' Second Amended Complaint was also based on a non-APA claim seeking relief in addition to the appropriations act tenant protection vouchers.  This was the claim that HUD's actions were racially discriminatory and violated the Equal Protection Clause of the Fifth Amendment to the United States Constitution. JA68-70. As set out above, the District Court's dismissal of all of Tenants' claims based on the purported mootness is legal error.

The decision to deny the motion for preliminary injunction on the same grounds is also legal error. *Shawnee Tribe*, 984 F.3d at 101–02.

The motion for preliminary injunction has been fully briefed and all of the evidence has been submitted. Tenants: Dkt. 27-Dkt. 35, Declarations and attachments, JA74-75, JA77-307; Dkt. 37 HUD Memorandum in Opposition to Motion for Preliminary Injunction; JA268-JA272. Neither the Tenants nor HUD requested a hearing on the motion but were willing to submit the case on documents. JA1-JA17, Docket sheet. The Tenants continue to live in HUD subsidized units that pose an imminent risk to health and safety including crime and other health and safety risks. See facts set out in Statement of the Case, Section I.E. Given the urgency of the matter, this Court can resolve the preliminary injunction here and now. *Shawnee Tribe*, 984 F.3d at 101–02.

## CONCLUSION

Tenants request this Court to reverse the District Court's Order dismissing all of the Tenants' claims and remand the case for the District Court to conform its further proceedings in the case to the principles set forth in the judicial decision. Tenants further request this Court to reverse the District Court's order denying their motion for preliminary injunction and remand the motion with direction to enter a preliminary injunction promptly.

Respectfully submitted,

*/s/Kimberly Brown Myles*
Kimberly Brown Myles
Attorney in charge
State Bar No. 24071805
LONE STAR LEGAL AID
PO Box 398
Houston, TX 77001-0398
Tel: 713.652.0077 ext. 1206
Fax: 713.652.3141
Email: kbrown@lonestarlegal.org
DC Bar No. TX0180

Attorney for Appellants

Velimir Rasic
State Bar No. 24065948
LONE STAR LEGAL AID
PO Box 398
Houston, TX 77001-0398
Tel: 713.652.0077 ext. 1204
Fax: 713.652.3141
Email: vrasic@lonestarlegal.org
DC Bar No. TX0179

Attorney for Appellants

Of Counsel:

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
D.C. Bar No. TX0171
Attorney for Appellants

Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.

52

3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
D.C. Bar No. TX0172
Attorney for Appellants

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because:

[X]    this document contains 11,881 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f), or

[  ]    this brief uses a monospaced typeface and contains [state the number of] line of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this document has been prepared in a proportionally spaced typeface using Microsoft Word 365, in Times New Roman 14-point typeface

[  ]    this document has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:
March 29, 2023

/s/Kimberly Brown Myles
Kimberly Brown Myles

54

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she has caused true and correct copies of this brief to be served upon all counsel of record via the Court's electronic filing system.

Dated:
March 29, 2023

/s/Kimberly Brown Myles
Kimberly Brown Myles